806 A.2d 296

William CHESLEY,

v.

GOLDSTEIN & BARON, CHARTERED, et al.

No. 773, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Aug. 30, 2002.

606

Cynthia E. Young (David G. Whitworth, Jr. and Whitworth, Smith & Trunnell, P.A., Crofton, on the brief), Annapolis, for appellant.

Leonard R. Goldstein, Rockville, for appellees.

Argued before DEBORAH S. EYLER, SHARER and RAYMOND G. THIEME, JR. (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

The Circuit Court for Prince George's County granted summary judgment to Leonard R. Goldstein, Esquire, and his law firm, Goldstein & Baron, Chartered ("G & B"), the appellees, on claims asserted against them by William F. Chesley, the appellant. On appeal, Chesley poses one question, which we have rephrased: Did the circuit court err in ruling that his claims were barred, as a matter of law, by claim or issue preclusion or by the law of the case doctrine?

## FACTS AND PROCEEDINGS

This case has a long and convoluted history. In 1986, Dr. Ervin Rose decided to sell commercial property ("the Property") he owned in Seabrook, Prince George's County. He entered into a listing agreement with Coldwell Banker Residential Real Estate, Inc. ("Coldwell Banker"), and one of its agents, C. Michael Parrish, that would give Coldwell Banker a 10% brokerage fee if the Property were sold by March 18, 1987. Coldwell Banker and Parrish made efforts to market the Property, including distributing information about it. Chesley, a successful real estate agent and developer in the Seabrook area, was one of the people who received the marketing information.

The Property did not sell by March 18, 1987. Thereafter, Rose and Coldwell Banker allegedly entered into an agreement modifying the original listing agreement and extending its expiration date.

Before the new expiration date, and before the Property sold, Rose died. Rose's sister, Rosalind Marsh, was appointed personal representative of his estate ("the Estate"). She retained Goldstein and G & B to represent her in her role as personal representative.

Coldwell Banker and Marsh did not enter into a new listing agreement for the Property, and Marsh did not sign the listing agreement her brother had entered into with Coldwell Banker. Parrish continued marketing the Property for sale, however. His efforts resulted in two offers to purchase the

Property, which were communicated to Marsh; she did not respond to them.

In the meantime, Chesley began negotiating with Goldstein, on behalf of Marsh and the Estate, to purchase the Property. When the negotiations culminated in an oral purchase agreement, Goldstein notified Parrish that Marsh had sold the Property. On April 11, 1988, Chesley and Marsh reduced their oral agreement to a written contract of sale.

The contract of sale was drafted by Chesley and his lawyer, except for an indemnification clause, which was drafted by Goldstein. In that clause, at paragraph 12 of the contract, the parties agreed that the Estate would not pay any real estate commission in connection with the sale, and payment of any such commission, if required, would be Chesley's sole responsibility. They further agreed that in any claim or action brought by an agent or broker to recover a commission, Chesley would hold harmless, defend, and indemnify the Estate, not only for any commission owed by also for all related costs, including attorney's fees incurred in defense.

The closing on the sale of the Property to Chesley took place on July 8, 1988. On September 1, 1988, in the Circuit Court for Prince George's County, Coldwell Banker sued the Estate on the listing agreement, claiming it was owed a 10% commission on the sale. Pursuant to the indemnification clause in the contract of sale, Chesley retained G & B to defend the Estate in the Coldwell Banker suit, and agreed to pay the firm's fees.

Coldwell Banker's case against the Estate went to trial. At the close of Coldwell Banker's case-in-chief, the court granted judgment in favor of the Estate. The evidence at trial included proof that the alleged modification agreement was a forgery.

Coldwell Banker took an appeal, and on October 1, 1992, in an unreported opinion, this Court reversed the judgment and remanded the case for a new trial. After remand, the case was settled. Thereafter, Chesley made some payments to-

ward G & B's attorney's fees in the case, but then stopped paying and refused to pay the balance.

On August 4, 1995, in the Circuit Court for Prince George's County, G & B sued Chesley for the fees it claimed he owed for its defense of the Estate in the Coldwell Banker suit, under the indemnification clause of the contract of sale (the "original claim"). G & B did not demand a jury trial. Chesley was served with the complaint, and on November 2, 1995, filed an answer. He did not file a demand for a jury trial then, or within 15 days.

On December 5, 1995, Chesley filed a "Counterclaim And Third Party Claim," against G & B (as counterdefendant) and Goldstein (as third-party defendant). At the same time, he filed a demand for jury trial, as "Defendant, Counter Plaintiff, and Third Party Plaintiff." Chesley's counterclaim and third-party claim sounded in fraud, negligent misrepresentation, and legal malpractice.

Chesley's fraud claim was two-pronged. First, he alleged that, during the purchase negotiations, Goldstein told him the Estate would not agree to pay any commission or brokerage fee on the sale. In justifiable reliance on that representation, he agreed to include the indemnification clause, undertaking liability for any commission or fee and for the cost of defense in any case for recovery of a commission or fee. Chesley then learned, after the sale, that Goldstein had petitioned and ultimately had received in the Orphans' Court for Prince George's County a $100,000 commission on the sale. Chesley alleged that that award was a commission on the sale of the Property, and Goldstein's having sought it showed that his statement during the purchase negotiations was a fraudulent misrepresentation communicated to induce Chesley to agree to the indemnification clause.

Second, Chesley alleged that because Goldstein and G & B had represented him in the Coldwell Banker suit, from October of 1988, to the Spring of 1993, Goldstein owed him a fiduciary duty to make disclosures about the Property honestly and fully; and that, in violation of that duty, Goldstein had

fraudulently concealed Coldwell Banker's involvement in bringing potential purchasers to the Property. Chesley further alleged that he had been induced to enter into the contract of sale, including the indemnification clause, in justifiable reliance on that allegedly fraudulent misrepresentation/omission.

In his fraud claim, Chesley sought compensatory damages of $150,000, and punitive damages of $1,500,000.

The factual allegations supporting Chesley's negligent misrepresentation claim were the same as those supporting his fraud claim, with one addition. Chesley alleged that it was a conflict of interest for Goldstein and G & B to represent him *and* the Estate; that they had had a duty to disclose the conflict, but failed to do so; and that while representing him they had been acting out of a primary allegiance to others, namely the Estate and Marsh. Chesley asserted that he had justifiably relied on Goldstein's and G & B's negligent representations and omissions and as a consequence had entered into the contract of sale, including the indemnification clause, without consulting independent counsel. He sought $150,000 in compensatory damages.

Finally, in his legal malpractice claim, Chesley alleged that Goldstein and G & B had breached their attorney-client relationship with him by 1) failing to disclose "the true nature of the facts and circumstances related to" Coldwell Banker's claim against the Estate; 2) failing to advise that because they were in a conflict of interest position, due to their representation of the Estate, he should engage independent legal counsel; and 3) failing to disclose that Goldstein had received a $100,000 "commission" (*i.e.,* the orphans' court award) from the Estate for the sale of the Property, contrary to the purpose of the indemnity clause. He further alleged that Goldstein and G & B had charged attorney's fees "which were induced by the fraud and/or negligent misrepresentation by Leonard R. Goldstein to Mr. Chesley, and were otherwise not necessary, fair and reasonable." He claimed the same injury

as in the first two counts, and sought $150,000 in compensatory damages.

Goldstein and G & B responded to the counterclaim and third-party claim with a joint motion to dismiss or for summary judgment, on the ground of limitations, which Chesley opposed. The court granted the joint motion. The court then held a pretrial conference and scheduled a trial date for the original claim. The Pre–Trial Conference Report is marked with a check next to "yes" for whether there was a jury demand.

After being postponed and rescheduled, trial commenced on December 7, 1998. That day, when it became apparent that the case was scheduled to be tried to the court, not by jury, Chesley's lawyer argued that even though summary judgment had been granted on the counterclaim and third-party claim, Chesley still was entitled to a jury trial on the original claim. The court disagreed and the case proceeded to a court trial.

Trial lasted three days. At the close of the evidence and after hearing argument, the court ruled in G & B's favor and awarded $57,767.81 in attorney's fees and interest. The court made detailed factual findings, which we quote in relevant part:

> The testimony before me, and I find as a fact, is that [the indemnification clause in the April 11, 1988 contract of sale] was the subject of negotiations between Mr. Chesley and Mr. Goldstein on behalf of the estate. I find that the negotiations were arms length negotiations, and further that the estate sought to avoid the risk of any claim for any commission by any broker for the sale of the property. The discussions were specific as to the Coldwell–Banker listing agreement, and the discussions were specific that the estate did not wish to pay any real estate commission to Coldwell–Banker.

> The defendant, Mr. Chesley, assumed the risk for this commission or any fees to defend any claim for this commission by executing the ... contract for sale dated April 11, 1988.

Settlement on this contract was had on July 8, 1988, and the lawsuit by Coldwell–Banker was filed on September 1, 1988. Upon service on the estate Mr. Goldstein, on behalf of the estate, wrote on September 21, 1988 in Plaintiff's exhibit number seven to Mr. Chesley, informing him that the lawsuit had been filed, that the estate looked to him to indemnify the estate pursuant to paragraph twelve of Plaintiff's exhibit number three.

Mr. Goldstein identified two options to Mr. Chesley. Those being Mr. Chesley could pay the attorney's fees for Mr. Goldstein's firm's continued representation of the estate in the lawsuit or Mr. Chesley could seek whatever counsel he wished to represent the estate in the lawsuit. At that point Mr. Chesley had the option to permit the estate to continue its own defense and to then be subject to . . . any defense costs for the estate and, if entered, any judgment against the estate.

He could retain any attorney of his own choosing to defend the estate or he could retain Mr. Goldstein's law firm to continue to defend the estate. I find as a fact that a telephone call between Mr. Chesley and Mr. Goldstein occurred subsequent to Mr. Chesley's receipt of Plaintiff's exhibit number seven. I find that during that call Mr. Chesley acknowledged his duty to defend under the indemnity agreement, which is contained in paragraph number twelve of Plaintiff's exhibit number three.

I find that Mr. Goldstein identified his law firm's fee schedule and that Mr. Chesley agreed to pay that fee schedule for Mr. Goldstein's law firm to continue to defend the estate in . . . the suit brought by Coldwell–Banker.

The lawsuit proceeded ultimately to trial, appeal and settlement. The bills of the law firm of Goldstein and Baron were submitted to Mr. Chesley. Partial payments on those bills were made up to and including August of 1992 . . . .

Sometime in March of 1993 Mr. Chesley met with Mr. Parrish . . ., after which he refused to pay any further legal expenses of the law firm of Goldstein and Baron . . . .

I find that the fees that were billed [by Goldstein & Baron] were fair and reasonable and necessary for the protection of the estate by the law firm in [the Coldwell–Banker suit].

I find no evidence of fraud in the inducement of . . . the contract of April 11, 1988, nor in the oral contract in September of 1988 or early October of 1988, wherein Mr. Chesley agreed to pay the legal fees for the estate in the law firm's defense of [the Coldwell Banker suit]. . . .

Chesley noted an appeal. He posed two questions respecting the original claim: 1) "Is an attorney who represents an estate and the personal representative and who has received a commission for sale of real property from the estate to the indemnitor entitled to attorney's fees from the indemnitor, in the absence of full and complete disclosure of the facts and the conflict of interest?"; and 2) "Is an indemnitee entitled to indemnification for the indemnitee's own negligence, in the absence of specific language in the controlling contract?" In a third question, he claimed the court had erred in granting summary judgment on his counterclaim and third-party claim on the ground of limitations.

On May 22, 2000, this Court filed an unreported opinion affirming the judgment in favor of G & B on its fee claim, reversing the summary judgment against Chesley on his counterclaim and third-party claim, and remanding the case to the circuit court for further proceedings. We began our discussion of Chesley's first issue by giving an overview of his main defense to the original claim:

[Chesley's] primary defense to G & B's claim for attorney's fees is based upon the principle that a fee agreement between the attorney and a client ordinarily will be set aside if it is shown that a party was represented by an attorney who simultaneously represented adverse interests, whether such interests were those of the attorney or those of other clients, and the attorney either exercised undue influence or perpetrated a fraud, or if the transaction was otherwise

unfair. Only full disclosure can prevent the transaction from being set aside.

*Chesley v. Goldstein & Baron,* No. 6227, slip op. at 7 (Md.Ct. Spec.App. July 27, 2000).

We concluded that Chesley was G & B's client, as a matter of law, and Goldstein and G & B therefore were obligated to disclose "all known information that [was] significant and material to the affairs ... of the [the fiduciary relationship]...." *Chesley,* Slip op. at 10 (quoting *Homa v. Friendly Mobile Manor, Inc.,* 93 Md.App. 337, 346–47, 612 A.2d 322 (1992), in turn, *quoted in, Platinum v. Impala Sales,* 283 Md. 296, 324, 389 A.2d 887 (1978) (quoting *Herring v. Offutt,* 266 Md. 593, 597, 295 A.2d 876 (1972)). *See also Allen v. Steinberg,* 244 Md. 119, 128, 223 A.2d 240 (1966); *Hambleton v. Rhind,* 84 Md. 456, 36 A. 597 (1897).). We rejected Chesley's contentions that the evidence compelled a finding of a conflict of interest and of fraudulent inducement, however. With respect to the claimed conflict of interest, we said that, on the uncontested evidence, though Chesley later was a client of Goldstein and G & B, he was *not* their client when the contract of sale was negotiated; rather, at that time, Goldstein was representing Marsh—the other party to the negotiation. We concluded that as a matter of law, "there could have been no conflict of interest on Goldstein's part in the arm's length transaction conducted by Chesley as the buyer and Goldstein as attorney for the seller." *Chesley,* Slip op. at 11.

With respect to the issue of fraudulent inducement to include the indemnification language in the contract of sale by failing to disclose information vital to Chesley's acceptance of that contract provision, we stated:

> [T]he simple response is that the trial court specifically found that there was no fraud and that Goldstein disclosed all pertinent information then available to him.

*Chesley,* Slip op. at 11.

We next rejected as legally incorrect Chesley's contention, at trial and on appeal, that Goldstein had received a "commission" on the sale of the Property. We explained that upon

petition to the orphans' court, under Md.Code (1974), § 7–602 of the Estates and Trusts Article ("ET"), Goldstein had received a fee for legal services rendered to the personal representative. At the time, ET § 7–601(a) permitted payment to the personal representative, called a "commission," based on a percentage of the value of the property subject to administration, and ET § 7–601(d)(1) specifically provided that in the event of a sale of real property by the personal representative the court could allow a commission on the proceeds as it considered appropriate, not to exceed 10%. In his petition for counsel fees, Goldstein had listed the maximum commission to which the personal representative would be entitled under that statute, and had requested a fee, which the orphan's court approved, that was in excess of the personal representative's total commissions.

We held that the fee Goldstein received in the orphans' court for representing Marsh as the personal representative of the Estate was not a commission on the sale of the Property, as a matter of law; and even if the fee was "considered as equivalent to a commission to him for the sale of" the Property, the trial court's findings were legally correct because "[p]ayment of a commission to Goldstein on the sale of the ... to [Chesley] would not be a material fact because the estate never sought indemnity from [Chesley] based on any sum paid to Goldstein by the estate." Slip op. at 14. Thus, "in no way [did the fee to Goldstein] create[ ] a conflict of interest between him and [Chesley] that required disclosure to [Chesley] when [Chesley] agreed to retain G & B to represent his interests in the Coldwell Banker suit." Slip op. at 14.

We went on to point out that Goldstein's "commission" could not have created an undisclosed conflict of interest that precipitated the Coldwell Banker suit because the suit predated the fee petition by years and the holding in that case, by this Court, was that the Estate possibly could be liable to Coldwell Banker if Marsh acknowledged that original listing—and not because of anything having to do with the fee that later was paid to Goldstein.

We addressed and rejected Chesley's second issue, the indemnification argument, and then agreed with his argument on issue three, whether the circuit court had erred in granting summary judgment on the counterclaim and third-party claim on limitations. Specifically, we held that the date that Chesley was on inquiry notice of those claims was a genuinely disputed material issue of fact that precluded the granting of summary judgment.

In the last part of the opinion, we pointed out that Chesley was arguing that if we were to reverse the grant of summary judgment on the counterclaim and third-party claim (which we were doing), he would be entitled to a jury trial on *all* issues, including on G & B's original claim. We explained that we were not going to consider that point because the record showed that the circuit court had stricken Chesley's jury trial demand, for not being timely; i.e., Chesley had waived his right to trial by jury, and Chesley had not challenged that decision on appeal.

After the unreported opinion was filed, Chesley timely filed a motion for reconsideration, asserting that the circuit court had not stricken his demand for jury trial. We granted the motion for reconsideration, withdrew our May 22 opinion, and on July 27, 2000, issued what became the final, filed opinion in the case. The opinion was unchanged on issues one and two. On issue three, we agreed that a review of the record disclosed that Chesley's jury trial demand had *not* been stricken. Accordingly, because Chesley had prayed a jury trial when he filed his timely counterclaim and third-party claim, he was "entitled, on remand, to a trial by jury on all issues 'triable of right by a jury.' " Slip op. at 26 (quoting *Hawes v. Liberty Homes*, 100 Md.App. 222, 233, 640 A.2d 743 (1994) (in quoting Md. Rule 2–325(e)). We went on to point out that, in his motion for reconsideration, Chesley was arguing that the circuit court had erred in ruling that once it granted summary judgment on the counterclaim and third-party claim, Chesley no longer was entitled to a jury trial on the original claim. Declining to address the issue, because Chesley had not raised it in his brief, we commented:

In reversing the summary judgment on [Chesley's] counterclaim we do not venture any opinion as to what, if any, preclusive effect the judgment of the circuit court on [G & B's] suit for attorney's fees [*i.e.,* the original claim] and our affirmance of that judgment may have on [Chesley's] counterclaim. This is not a matter before us on this appeal. Slip op. at 27. Our mandate affirmed the judgment in favor of G & B on the original claim and vacated the judgment against Chesley on the counterclaim and third-party claim.

Chesley filed a petition for *certiorari* in the Court of Appeals, which was denied on December 12, 2000.

On remand in the circuit court, Goldstein and G & B moved for summary judgment, arguing that the doctrines of *res judicata,* collateral estoppel, and the law of the case precluded any further litigation of the issues raised in Chesley's counterclaim and third-party claim. Chesley filed an opposition memorandum.

The court held a hearing and granted the motion for summary judgment. It ruled that, in the court trial on the original claim, Chesley had pursued affirmative defenses based on the same set of operative facts central to his counterclaim and third-party claim; and those facts were actually litigated and decided against him. Therefore, under the doctrine of collateral estoppel, the facts were conclusively established, and could not be genuinely disputed. Because the facts were inconsistent with any finding in favor of Chesley on his counterclaim and third-party claim, G & B and Goldstein were entitled to judgment in their favor, as a matter of law.

The court also ruled that Chesley's affirmative defenses to the original claim and his affirmative claims (as asserted in the counterclaim and third-party claim) could not be split, and therefore the counterclaim and third-party claim were barred by *res judicata:*

I find based on my review of the transcript of the previous proceedings, the motion for judgment filed at the close of the plaintiff's case, and relied on again at the close of the defense case, my review of the counter claim and third

party claim and my review of the opinion of the Court of Special Appeals that the issues raised now affirmatively— the issues raised now requesting affirmative relief on behalf of Mr. Chesley against [Goldstein and G & B] were raised, were litigated, were decided, in the original claim when I granted the affirmative relief to the plaintiff Goldstein and Baron.

The defense to ... that claim for legal services was that the attorney, Mr. Goldstein, and the law firm, Goldstein and Baron, had a conflict of interests, did not disclose fully the facts to Mr. Chesley, and consequently committed legal malpractice.

These are the claims in both the counter claim and the third party claim. I find that I resolved the facts to those— to that counter claim and third party claim by granting the affirmative relief in the complaint.

If there was not a specific fact so found, I find that the counter plaintiff and third party plaintiff cannot split their claims by litigating a portion in one lawsuit and saving a portion of that for a second lawsuit. That is not what is required by the appellate case law requiring that a claim to be litigated either as a claim for affirmative relief or as a defense to a claim for affirmative relief must be fully litigated or lost. And for these reasons I will find no dispute of any material fact as to whether ... or not those issues have been decided. I find that they have.

Chesley noted a timely appeal to this Court.

### DISCUSSION

Chesley contends that the circuit court's decision to grant summary judgment on his counterclaim and third-party claim was legally incorrect, and was inconsistent with, and defeated, this Court's decision in the prior appeal that he was entitled to a jury trial on all issues triable of right by jury. He also contends, alternatively, that the court's collateral estoppel ruling was in error because not all the facts essential to his

counterclaim and third-party claim actually were litigated in the court trial on the original claim.

■ Article 23 of the Maryland Declaration of Rights guarantees the right of trial by jury in a civil action in which more than $10,000 is in controversy. Rule 2–325 governs the procedure for electing a jury trial in a civil action. "Any party may elect a trial by jury of any issue triable of right by a jury by filing a demand therefor in writing . . . " Md. Rule 2–325(a). Traditionally, claims that are triable of right by a jury are legal, as opposed to equitable, claims. *Kann v. Kann,* 344 Md. 689, 699–700, 690 A.2d 509 (1997). If a party does not file a demand for jury trial "within 15 days after service of the last pleading filed by any party directed to the issue," he waives his right to trial by jury. Md. Rule 2–325(b).

> The Rule spells out the effect of the election of a jury trial: When trial by jury has been elected by· any party, the action, including all claims whether asserted by way of counterclaim, cross-claim, or third-party claim, as to all parties, and as to all issues triable of right by a jury, shall be designated on the docket as a jury trial.

Md. Rule 2–325(e).

A counterclaim and a third-party claim are "pleadings." Md. Rule 1–202(s). The times for filing a counterclaim and a third-party claim are the same, and are set forth in Rules 2–331 and 2–332, respectively. If a party files either one more than 30 days after the time for filing that party's answer, any other party may object and move to strike it. Md. Rule 2–331(d); Md. Rule 2–332(e).

In this case, Chesley filed his counterclaim and third-party claim December 5, 1995. Neither G & B nor Goldstein objected or moved to strike. While the counterclaim and third-party claim were based on the same set of operative facts as the original claim, and asserted defenses that if accepted by a fact finder would negate G & B's original claim, they also sought affirmative relief for fraud and negligence in the form of compensatory and punitive damages. Thus, the counterclaim and third-party claim were not merely mirror

image denials of the original claim, that is, an answer dressed up as a counterclaim/third-party claim. *See East v. Gilchrist,* 293 Md. 453, 461–62, 445 A.2d 343 (1982).

Chesley's demand for jury trial was filed with the counter-claim and third-party claim, and thus was filed within 15 days of service of the last pleading filed by any party directed to the issue. Accordingly, under Rule 2–325(e), when Chesley elected a jury trial, "the action, including all claims," *i.e.,* the original claim, counterclaim, and third-party claim, was to be "designated on the docket as a jury trial."

The doctrine of *res judicata* (also called direct estoppel or claim preclusion) applies when the parties to a subsequent suit are the same or in privity with the parties to a prior suit; the first and second suits present the same claim or cause of action; and there was a final judgment rendered on the merits in the first suit, by a court of competent jurisdiction. *FWB Bank v. Richman,* 354 Md. 472, 492–93, 731 A.2d 916 (1999); *deLeon v. Slear,* 328 Md. 569, 580, 616 A.2d 380 (1992); *Poteet v. Sauter,* 136 Md.App. 383, 411, 766 A.2d 150 (2001). When those three elements are satisfied, the first claim is merged into the judgment in the first suit and the second claim is barred.

For purposes of *res judicata,* whether claims are the same is determined by application of the "transaction test," as set forth in section 24 of the *Restatement (Second) of Judgments* (1982). *See Kent County Bd. of Ed. v. Bilbrough,* 309 Md. 487, 489–90, 525 A.2d 232 (1987), which denotes a "claim" as including all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the claim arose. *FWB v. Richman,* 354 Md. at 493, 731 A.2d 916 (citing *Alvey,* at 390, 171 A.2d 92 (1961)); *MPC v. Kenny,* 279 Md. 29, 32, 367 A.2d 486 (1977). The practical significance of this definition of a "claim" is that *res judicata* bars subsequent litigation not only of what was decided in the original litigation but also of what *could have been decided* in that original litigation. *Gertz v. Anne Arundel County,* 339 Md. 261, 269, 661 A.2d

1157 (1995) (citing *deLeon*, 328 Md. at 580, 616 A.2d 380. As the Court of Appeals explained in *Alvey v. Alvey*,

> a judgment between the same parties and their privies is a final bar to any other suit upon the same cause of action, and is conclusive, not only as to all matters that have been decided in the original suit, but as to all matters which with propriety could have been litigated in the first suit. . . .

225 Md. 386, 390, 171 A.2d 92 (1961). *See also Colandrea v. Wilde Lake Community Ass'n*, 361 Md. 371, 388, 761 A.2d 899 (2000); *Rowland v. Harrison*, 320 Md. 223, 229, 577 A.2d 51 (1990); *Wolfe v. Anne Arundel County*, 135 Md.App. 1, 27, 761 A.2d 935 (2000).

■ Under the doctrine of collateral estoppel (also called issue preclusion), "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Murray Int'l Freight Corp. v. Graham*, 315 Md. 543, 547, 555 A.2d 502 (1989) (quoting *Restatement (Second) Judgments, supra*, § 27; *MPC v. Kenny*, 279 Md. 29, 32, 367 A.2d 486 (1977). Thus, as the Court of Appeals has explained:

> Collateral estoppel is concerned with the issue implications of the earlier litigation of a different case, while *res judicata* is concerned with the legal consequences of a judgment entered earlier in the same cause. The two doctrines are based upon the judicial policy that the losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on issues raised, or that should have been raised.

*Colandrea v. Wilde Lake Community Assoc.*, 361 Md. at 390–91, 761 A.2d 899 (internal citation omitted).

In *Rowland v. Harrison, supra*, 320 Md. 223, 577 A.2d 51, the Court addressed the *res judicata* effect of a party's failing to interpose a counterclaim. In that case, a veterinarian sued a customer for unpaid veterinary and boarding charges incurred for the customer's horse (the debt action) and the

customer filed a separate action for veterinary malpractice for injuries to and death of the horse (the malpractice action). After the customer's motion to consolidate the cases was denied, she filed a counterclaim in the debt action asserting her malpractice claims. At trial on the debt action, she moved for leave to voluntarily dismiss her counterclaim, without prejudice, because she had been unable to engage in sufficient discovery or obtain the services of an expert witness. The court granted her request. At the close of the evidence in the debt action, it entered judgment in favor of the veterinarian. The customer did not note an appeal.

Thereafter, in the malpractice action, the veterinarian moved for summary judgment and it was granted, on the ground of *res judicata*. The court ruled that the Maryland rule on counterclaims was compulsory and that the customer's failure to litigate the issue of the veterinarian's malpractice as a defense to the debt action precluded her from asserting malpractice as a separate claim in a second suit.

The Court of Appeals reversed. After explaining that Maryland's counterclaim rule is permissive, not compulsory, it adopted section 22 of *Restatement (Second) of Judgments*, entitled, "Effect of Failure to Interpose Counterclaim," which states, in pertinent part:

(1) Where the defendant may interpose a claim as a counterclaim but he fails to do so, he is not thereby precluded from subsequently maintaining an action on that claim, except as stated in Subsection (2).

(2) A defendant who may interpose a claim as a counterclaim in an action but fails to do so is precluded, after the rendition of judgment in that action, from maintaining an action on the claim if: ... (b) The relationship between the counterclaim and the plaintiff's claim is such that successful prosecution of the second action would nullify the initial judgment or would impair rights established in the initial action.

320 Md. at 232, 577 A.2d 51.

The Court held:

[G]iven the permissive nature of our counterclaim rule and the position taken by the *Restatement*, . . . where the same facts may be asserted as either a defense or a counterclaim, and the issue raised by the defense is not litigated and determined so as to be precluded by collateral estoppel, the defendant in the previous action is not barred by *res judicata* from subsequently maintaining an action on the counterclaim.

*Id.* at 235–36, 577 A.2d 51 (footnotes omitted). The Court explained that in the case before it the relationship between the debt action and the malpractice action was not such that the successful prosecution of the malpractice action would nullify the judgment in the debt action, or would impair rights established in that action. The Court adopted the commentary to section 22(2)(b) that

[t]here are occasions . . . when allowance of a subsequent action would so plainly operate to undermine the initial judgment that the principle of finality requires preclusion of such an action . . . [but] it is not sufficient that the counterclaim grow out of the same transaction or occurrence as the plaintiff's claim, nor is it sufficient that the facts constituting a defense also form the basis of the counterclaim. The counterclaim must be such that its successful prosecution would nullify the judgment. . . .

320 Md. at 236, 577 A.2d 51 (quoting Comment f to *Restatement (Second) Judgments*, § 22).

We conclude from the rules and case law discussed above that neither *res judicata* nor collateral estoppel applies to this case. Those doctrines apply when there is a first action or proceeding and then a subsequent action or proceeding between the same parties; and the first proceeding results in a final judgment. In other words, an essential element of both doctrines is a prior adjudication between the parties. Throughout all the sections of the *Restatement (Second) Judgments* that address claim preclusion and issue preclusion, the authors speak of the effect, if any, of a judgment or factual determination underlying a judgment in a first proceeding on

the claims asserted or the facts at issue in a second proceeding or action.

In this case, there is but one action or proceeding, and no prior adjudication. G & B's original claim and Chesley's counterclaim and third-party claim were separate claims in the same case. When all of them were disposed of, two by summary judgment and one by a trial on the merits, there was a "final judgment" within the meaning of Md.Code (1998 Repl.Vol.), section 12–301 of the Courts & Judicial Proceedings Article. Chesley noted an appeal to this Court from that judgment. Indeed, before the original claim and the counterclaim and third-party claim all were disposed of, there was no final and hence appealable judgment. *See* Md. Rule 2–602(a).

The ruling of this Court on appeal affirmed the judgment in favor of G & B on the original claim and vacated the judgment against Chesley on his counterclaim and third-party claim. When a counterclaim seeks relief exceeding the amount or different in kind from that sought in the original claim, the court may enter an order that upon disposition of all claims of all parties becomes a separate judgment from the judgment entered on the original claim. *See, e.g., John E. Day Associate, Inc. v. George G. Cowman, Jr., Inc.,* 1998 Md.App. LEXIS 184. When a counterclaim seeks to defeat or limit the recovery sought in the original claim, upon disposition of all claims of all parties, a single judgment is entered. Md. Rule 2–615; Niemeyer, Paul V. & Linda M. Schuett, *Maryland Rules Commentary* 475–476 (Michie 1992) (1984). In this case, as we have stated, Chesley's counterclaim and third-party claim sought to defeat recovery by G & B and also sought additional relief beyond that. Accordingly, all of the original claim and a part of the counterclaim and third-party claim were a single claim, that could be decided only by entry of a single judgment.

Thus, in addition to the fact that there simply were not two proceedings in this case, this Court's affirmance, in the first appeal, of the judgment in favor of G & B did not constitute a prior adjudication of the original claim, for purposes of *res*

*judicata* or collateral estoppel. Again, all of the claims were brought in the same suit; and but for the error of the circuit court in disposing of the counterclaim and third-party claim on summary judgment, all of the claims would have been decided on the merits together. This Court's correction of that error meant that the counterclaims and third-party claim were yet to be resolved, and did not change the status of the original claim to one that had been decided in a prior proceeding.

Notwithstanding our reference to claim or issue preclusion in our opinion in the first appeal, about which we shall say more later, neither applied to this case. For purposes of *res judicata,* i.e., with respect to claim splitting, the trial court's ruling treated Chesley's counterclaim and third-party claim as if the situation covered in section 22 of the *Restatement (Second) Judgments* existed: that there had been a prior proceeding on the fee claim in which Chesley had not interposed a counterclaim or third-party claim and that proceeding had resulted in a judgment in favor of G & B. That situation did not exist because there was but one proceeding, and Chesley *did* interpose his counterclaim and third-party claim. Again, but for the erroneous grant of summary judgment, those claims would have been decided with the original claim.

For purposes of collateral estoppel, the trial court's ruling treated Chesley's counterclaim and third-party claim as if they had been brought in a subsequent action, after an adjudication in favor of G & B on the fee claim in a prior action. *See Restatement (Second) Judgments,* § 27 ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."). There was no subsequent action in this case, howeverer.

Interestingly, a portion of comment d to section 27 of the *Restatement (Second) Judgments* addresses the issue of the right to jury trial in a second proceeding between the same parties when essential factual issues were decided by a court

in the first proceeding. It states: "The determination of an issue by a judge in a proceeding conducted without a jury is conclusive in a subsequent action whether or not there would have been a right to a jury in that subsequent action if collateral estoppel did not apply." This comment implicitly recognizes that either party in the first action could have elected a jury trial on the issues that, once actually litigated in that action, would become conclusive upon them in a second action. Thus, application of the doctrine of collateral estoppel does not impair the right to trial by jury, because the right must already have been waived in the first action.

Having determined that the trial court was legally incorrect in ruling that Chesley's counterclaim and third-party claim were barred by *res judicata* or that he was precluded by collateral estoppel from proving facts essential to those claims because they previously were litigated and decided against him, we shall reverse the grant of summary judgment on those claims and remand the case to the circuit court for further proceedings. We shall not conclude our analysis and disposition there, however, because there is an underlying inconsistency between our decision in the first appeal—more specifically, our affirmance of the judgment in favor of G & B on the original claim—and our decision in this appeal, which, if left unresolved, potentially will produce inconsistent judgments.

Recently, in *Stickley v. Chisholm*, 136 Md.App. 305, 765 A.2d 662 (2001), we quoted the following observations of the United States Supreme Court:

Where the practice permits a partial new trial, it may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.

*Id.* at 315, 765 A.2d 662 (quoting *Gasoline Products Co., Inc. v. Champlin Refining Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 75 L.Ed. 1188 (1931)) (citations omitted). In the *Gasoline Products* case, the Supreme Court held that a partial new trial ordered by the First Circuit Court of Appeals on an issue of

damages in a counterclaim would deny the defendant his right to a fair trial:

[T]he question of damages on the counterclaim [was] so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial.

283 U.S. at 500, 51 S.Ct. 513. In *Stickley,* we applied that reasoning to hold that, while the disposition of a partial new trial is permitted by Rule 8–604(b), for an appellate court to grant a partial new trial, " 'it must clearly appear that the effect of the error did not extend to all the issues [to be] tried.' " 136 Md.App. at 317, 765 A.2d 662 (quoting *McBride v. Huckins,* 76 N.H. 206, 213, 81 A. 528 (N.H.1911)).

 It is apparent from the record in this case that the relevant operative facts underlying the liability issues in G & B's original claim and Chesley's counterclaim and third-party claim are "so interwoven" that they cannot be determined independently. Thus, even if the trial on G & B's original claim had proceeded before a jury, instead of being tried to the court, the reversal of the grant of summary judgment on the counterclaim and third-party claim would have necessitated a retrial of *all* the claims, including the original claim. The factual issues in the original claim and the factual issues in the counterclaim and third-party claim are interdependent and therefore are not capable of being determined separately, in two separate trials, by two different fact finders.

 In addition, because the factual issues in all three claims are interwoven, Chesley's right to have a jury determine the issues triable of right by jury in this case cannot be enforced in the absence of a retrial on all of the claims. This is why, under Rule 2–325(f), once a party properly elects a jury trial, all issues triable of right by a jury, whether on a claim, counterclaim, or third-party claim, are to be decided by a jury:

"A demand properly made by any party on any claim in the action has the effect of submitting to the jury all issues

triable of right by a jury. *Section (e) of [Rule 2–325] does not permit submitting some "legal" claims to the jury and reserving others for trial by the court.* This rule evidences an intent to preserve and ·favor the jury trial right even if, to preserve it, a technical expansion might occur."

*Hawes v. Liberty Homes,* 100 Md.App. 222, 234, 640 A.2d 743 (1994) (quoting *Hawes v. Liberty Homes,* 100 Md.App. 222, 234, 640 A.2d 743 (1994)) (quoting Niemeyer, Paul V. & Linda M. Schuett, *Maryland Rules Commentary* 160–61 (Michie 1992) (emphasis in *Hawes*)).

Thus, while in our holding in the first appeal we decided that Chesley had not waived his right to a jury trial "on all issues triable of right," and determined that he was entitled to a jury trial on remand, our disposition effectively undid that decision by affirming the judgment on the original claim when all the claims arose out of the same transactions and were based on an interrelated set of facts incapable of being segregated and decided separately.

The doctrine that is relevant to the case at bar is the "law of the case," which, unlike *res judicata* and collateral estoppel, applies to court decisions made in the same, not a subsequent, case. The Court of Appeals recently discussed the "law of the case" doctrine, in *Turner v. Housing Authority of Baltimore City,* 364 Md. 24, 770 A.2d 671 (2001). It explained that under that doctrine a trial court is bound by the decision of an appellate court in the case before it:

" 'Once [the appellate court] has ruled upon a question properly presented on an appeal, or, if the ruling be contrary to a question that could have been raised and argued in that appeal on the then state of the record, ... such a ruling becomes the 'law of the case' and is binding on the litigants and courts alike, unless changed or modified after reargument, and neither the questions decided nor the ones that could have been raised and decided are available to be raised in a subsequent appeal.' "

364 Md. at 32, 770 A.2d 671 (quoting *Loveday v. State,* 296 Md. 226, 230, 462 A.2d 58 (1983) (in turn quoting *Fidelity–*

*Baltimore Nat'l Bank & Trust Co. v. John Hancock Mut. Life Ins. Co.,* 217 Md. 367, 372, 142 A.2d 796 (1958)) (citations omitted). The Court added that the doctrine does not apply in three exceptional situations: 1) when the evidence in a subsequent trial in the case is substantially different than it was in the initial trial; 2) when " 'controlling authority has since made a contrary decision on the law applicable to such issues' "; or 3) when the appellate court's decision was " 'clearly erroneous and would work a manifest injustice.' " 364 Md. at 34, 770 A.2d 671 (quoting *Smith Int'l, Inc. v. Hughes Tool Co.,* 759 F.2d 1572, 1576 (Fed.Cir.1985), *vacated on other grounds as moot,* 839 F.2d 663 (Fed.Cir.1988)).

In *Hawes v. Liberty Homes, Inc., supra,* then-Chief Judge Wilner discussed the law of the case doctrine as it applies to this Court, with respect to a prior decision of a panel of this Court in the same case. *Hawes* was a contractual dispute between homeowners and a building contractor that centered on whether the homeowners had satisfied a financing contingency in the contract, whether the builder had waived it, or whether it had not been satisfied so that the contract was null and void. There were claims and counterclaims for legal and equitable relief. The case was tried to a jury, which returned a verdict for the homeowners on their breach of contract claim, based on an implicit finding that they had satisfied the financing contingency. Yet, on the same evidence, the court denied the homeowners' request for specific performance, upon a finding that the financing contingency had not been satisfied or waived, and that there was no contract to enforce. In post-trial proceedings, the court granted a motion for new trial on the ground of excessive damages.

In an appeal to this Court, a panel in an unreported opinion held that the trial court was not bound by the jury's factual findings in ruling on the specific performance claim. The Court affirmed the trial court's judgment denying specific performance and remanded the case for the new trial ordered by the trial court on the breach of contract claim to proceed.

On remand, the builder filed a motion for summary judgment on the ground, *inter alia,* that the plaintiffs were bound by the factual findings of the trial court on the specific performance claim, most importantly, that they had not satisfied the financing contingency and therefore no contract existed to be breached. The motion was granted and a second appeal was taken.

We held in the second appeal that the trial court erred in granting summary judgment. Noting that to decide the propriety of the grant of summary judgment, we first had to "deal with the holding of the earlier panel of this Court," 100 Md.App. at 228, 640 A.2d 743, Judge Wilner explained that Court of Appeals' precedent clearly established that in a case involving common issues of law and equity, in which the equitable claims are to be resolved by the court and the legal claims are to be resolved by the jury, the court is bound by the jury's determination of common issues and does not have the power to make findings inconsistent with that of the jury. 100 Md.App. at 229, 640 A.2d 743 (citing *Edwards v. Gramling Engineering Corp.,* 322 Md. 535, 588 A.2d 793, *cert. denied,* 502 U.S. 915, 112 S.Ct. 317, 116 L.Ed.2d 259 (1991), and *Higgins v. Barnes,* 310 Md. 532, 530 A.2d 724 (1987)). We held that the case was one of those unusual exceptions in which in the second appeal, we were not bound by the decision of the panel in the first appeal, under the law of the case doctrine:

> [T]he first panel, although stating a correct general rule, rendered an ultimate holding that was clearly inconsistent with *Higgins* and *Edwards,* cases that were controlling. We are not asked here to revisit that decision directly. The issue before us now is not whether the circuit court erred in denying the claim for specific performance on the grounds it stated but goes one step beyond that; it is whether our prior affirmance of that denial serves to prevent appellants from receiving a new trial on their claim for breach of contract damages.

To hold that it does preclude a new trial would be manifestly unjust. When the earlier panel ruled on the

circuit court's denial of appellants' claim for specific performance, it necessarily anticipated that there would be a retrial on the damage claim, for that was the then-current posture of the case—a posture the earlier panel declined to disturb. Certainly, neither the trial court, in denying appellants' claim for specific performance, nor the first panel of this Court, in affirming that ruling, anticipated that appellants would be barred in a new trial from pursuing their breach of contract claim. To now extend a prior incorrect holding by this Court to preclude appellants from receiving the new trial expressly granted by the trial court would, in our view, create manifest injustice.

100 Md.App. at 232, 640 A.2d 743.

Judge Wilner characterized the law of the case doctrine as "one of appellate procedure and convenience rather than . . . a fixed, immutable doctrine like *res judicata* or collateral estoppel," and explained that while the doctrine binds a Maryland trial court to a prior decision of this Court in the same case, this Court may, but need not, invoke the doctrine; in other words, we are not precluded from opening up and reconsidering an issue we decided earlier, in the same case, when exceptional circumstances so warrant. *Id.* at 230, 640 A.2d 743. Thus, "[d]ecisions rendered by a prior appellate panel [of the Court of Special Appeals] will generally govern the second appeal, unless (1) the previous decision [was] patently inconsistent with controlling principles announced by a higher court and is therefore clearly incorrect, *and* (2) following the previous decision would create manifest injustice." *Id.* at 231, 640 A.2d 743. *See Maryland Cas. Co. v. City of South Norfolk,* 54 F.2d 1032, *modified by rehearing on other grounds,* 56 F.2d 822 (4th Cir.1932); *Smith Int'l,* 759 F.2d 1572, *vacated on other grounds as moot,* 839 F.2d 663; *Eichman v. Fotomat Corp.,* 880 F.2d 149 (9th Cir.1989). *See also Stokes v. American Airlines, Inc.,* 142 Md.App. 440, 446–47, 790 A.2d 699 (2002).

■ In the case at bar, we face a situation similar to that in *Hawes.* The precedent we have cited above, from the

Supreme Court and as established by the Court of Appeals in Rule 2–325, mandated that Chesley was entitled on remand to a jury trial on all issues triable of right and that the factual issues in the original claim, counterclaim, and third-party claim be decided together, in one trial, by jury. That was the necessary disposition of the case given our holding on issue three, regardless of whether Chesley argued on appeal that the trial court should have held a jury trial on the original claim. As explained above, even if the original claim had been tried by a jury, the only proper disposition on appeal given our holding was to vacate the judgments on all the claims and remand the case for a new trial, by jury, on all the claims.

Not doing so, and instead directing a partial new trial, on the counterclaim and third-party claim only, was a legal error on our part that created, and if not corrected will continue to create, a manifest injustice. For Chesley to have a fair trial, the original, counterclaim, and third-party claims must be tried together; and to effectuate Chesley's jury trial right, the trial on all the issues in those claims, being factual issues, must be to a jury. The only way to accomplish that is to vacate the judgment in the original claim, which we shall do.

Notwithstanding our decision not to apply the law of the case doctrine to that part of the prior decision of a panel of this Court disposing of the appeal by affirming the judgment on the original claim, we shall apply the doctrine to the panel's legal rulings on the issues Chesley raised in his attack on that judgment. As explained above, in our decision in the first appeal we concluded that as a matter of law, on facts that are not disputed and therefore do not need to be resolved by a jury (or any fact-finder): 1) the commission Goldstein received upon petition to the orphans' court was not a real estate commission or fee for the sale of the Property and, regardless of how it is described, Goldstein's having received it did not create a conflict of interest requiring him to disclose it to Chesley when Chesley agreed to retain G & B to represent him in the Coldwell Banker suit; and 2) Goldstein and G & B did not represent Chesley during the purchase negotiations

and thus there could have not have been a conflict of interest on Goldstein's part during those negotiations.

These holdings of law remain the law of the case and Chesley is bound by them. The other factual allegations underlying Chesley's fraudulent inducement and other claims, which the court, as a fact-finder, rejected in the first trial are for a jury as fact finder to decide in the retrial.

**JUDGMENT IN FAVOR OF APPELLEE GOLDSTEIN AND BARON ON THE ORIGINAL CLAIM FOR ATTORNEY'S FEES VACATED; JUDGMENT IN FAVOR OF GOLDSTEIN AND BARON AND LEONARD GOLDSTEIN, ESQUIRE, ON THE COUNTERCLAIM AND THIRD–PARTY CLAIM, RESPECTIVELY, REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEES.**