845 A.2d 1

Margaret M. HUGHES

v.

William R. INSLEY, Jr., et al.

No. 00558, Sept. Term, 2002.

Court of Special Appeals of Maryland.

Oct. 7, 2003.

Reconsideration Denied March 8, 2004.

John F. Hall (Alexis E. Kramer, on brief), Easton, for appellant.

Michael L. Pullen, Easton, for appellee.

Argued before SALMON, BARBERA, RAYMOND G. THIEME, JR. (Ret., Specially Assigned), JJ.

## ON MOTION FOR RECONSIDERATION

SALMON, J.

 Central to the resolution of the issues presented in this appeal is the application of the doctrine of claim preclusion.

The doctrine of *res judicata* (also called direct estoppel or claim preclusion) applies when the parties to a subsequent suit are the same or in privity with the parties to a prior suit; the first and second suits present the same claim or cause of action; and there was a final judgment rendered on the merits in the first suit, by a court of competent jurisdiction. When those three elements are satisfied, the first claim is merged into the judgment in the first suit and the second claim is barred.

For purposes of *res judicata,* whether claims are the same is determined by application of the "transaction test," as set forth in section 24 of the *Restatement (Second) of Judgments* (1982). *See Kent County Bd. of Ed. v. Bilbrough,* 309 Md. 487, 489–90, 525 A.2d 232 (1987), which denotes a "claim" as including all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the claim arose. The practical significance of this definition of a "claim" is that *res judicata* bars subsequent litigation not only of what was decided in the original litigation but also of what *could have been decided* in that original litigation. As the Court of Appeals explained in *Alvey v. Alvey:*

> a judgment between the same parties and their privies is a final bar to any other suit upon the same cause of action, and is conclusive, not only as to all matters that have been decided in the original suit, but as to all matters which with propriety could have been litigated in the first suit. . . .

225 Md. 386, 390, 171 A.2d 92 (1961).

*Chesley v. Goldstein & Baron, Chartered,* 145 Md.App. 605, 622–23, 806 A.2d 296, *cert. granted,* 372 Md. 132, 812 A.2d 288 (2002) (some citations omitted)(emphasis added).

In the subject case, the parties are at odds as to who owns 186 acres of land located in Dorchester County, Maryland. The trial judge ruled that an ejectment suit filed by the plaintiff, Margaret Hughes, was prohibited by the plaintiff's failure (in a prior suit to quiet title brought against the same defendant) to have prevailed in regard to the same "transaction" as that involved in the second case. The court also ruled that a prior counterclaim to quiet title asserted by defendant/counter-plaintiff, William Russell Insley, Jr., against Mrs. Hughes was similarly barred due to William Russell Insley, Jr.'s, failure (in that earlier counterclaim) to prevail. As a result of that ruling, the parties were left in legal limbo, inasmuch as Mrs. Hughes, who possesses legal title, could not prevent William Russell Insley, Jr., from using the land, and William Russell Insley, Jr., could use the land but was unable to assert legal title to it.

In this appeal, both parties claim that the trial court misapplied the doctrine of claim preclusion in regard to his/her claim. But, as to the opponent's claim, both parties assert that the doctrine was correctly applied.

## I. *THE LAND*

The disputed 186 acres is located in southern Dorchester County. To the east of the property is the Black Water Wild-Life Refuge, which is owned by the federal government; to the west lies Maple Dam Road, as well as several parcels of land owned by various members of the Insley family. To the north is land owned by appellant, cross-appellee, Margaret Hughes ("Mrs.Hughes"). Land situated to the south of the 186–acre parcel is owned by Shirley R. Quidas and other third parties. The record title owner of the 186–acre parcel is Mrs. Hughes. She inherited the land from her grandfather, Charles H. Stewart, who died in 1948. Mrs. Hughes, alone,

paid taxes on the property continuously between 1948 and tax year 2000. In tax year 2001, property taxes on the land were paid by appellant, cross-appellee, William Russell Insley, Jr. ("Russell, Jr.").

About thirty or forty of the 186 acres in dispute were cleared, for farming purposes, by Russell, Jr.'s, father, William Russell Insley, Sr. ("Russell, Sr."); the remainder of the 186 acres is made up of a combination of woodlands and wetlands. No one resides on the disputed property.

## II. *THE INSLEY CLAIM*

Russell, Jr., claims that members of the Insley family have adversely possessed the 186 acres since at least the 1930's, when Curtis Insley regularly took timber off the property, used it for hunting and trapping, and excluded others from using it.

Curtis Insley died, intestate, in 1960. According to Russell, Jr., and his mother, Lottie Mae Insley ("Lottie Mae"), after Curtis's death, Russell, Sr., continued Curtis's practice of treating the 186–acre parcel as if he owned it. As mentioned earlier, Russell, Sr., cleared thirty or forty acres of the property for purposes of farming; additionally, after Curtis Insley's death, Russell, Sr., dug ditches and ponds on the property, took timber from the land, excluded others from entering onto it, erected no trespassing signs, hunted on the property, and gave permission to friends of his to hunt on the land.

Russell, Sr., died, testate, in January of 1992. In his will, he left all his property to his wife, Lottie Mae. The will named Lottie Mae as Russell, Sr.'s, personal representative.

Russell, Jr., asserts that he has carried on activities on the property—similar to those engaged in by his father—since the date in January 1992 when his father died.

## III. *THE FIRST LAWSUIT*

In September 1992, approximately nine months after Russell, Sr., died, Mrs. Hughes, as record owner of the property,

filed a suit in the Circuit Court for Dorchester County to quiet her title to the 186–acre parcel.[1] Mrs. Hughes alleged in her complaint that the 186–acre parcel was currently "vacant" and "unoccupied." The complaint named as a defendant Lottie Mae and "all other persons having or claiming interest in" the subject property.

Mrs. Hughes asked the court, pursuant to section 14–108(a) of the Real Property Article ("RP") of the Maryland Code (1974, 1996 Repl.Vol.),[2] to determine that she had "absolute ownership and right of disposition of the disputed property." She also asked that the court enjoin "each defendant claiming a hostile outstanding right from further asserting such claims."

Lottie Mae and Russell, Jr., filed answers to the complaint. The two also filed counterclaims, each of which was substantively identical. The counterclaims alleged that the counterplaintiffs and their predecessors had been in "actual and/or constructive peaceable possession of the 186 acres in contro-

---

1. Technically, there was more than one plaintiff in the first lawsuit. The will of Charles Stewart named Mrs. Hughes as his personal representative. The land in question was bequeathed one-third to Mrs. Hughes; one-third to Mrs. Hughes in trust for her mother during her mother's life, with the remainder to Mrs. Hughes; and one-third to Edith I. Applegarth, who had two children: Anita I. Young and Charles H. Applegarth.

By 1992, both Mrs. Hughes's mother and Edith Applegarth were dead. As a consequence, Mrs. Hughes had record title to a two-thirds interest in the property, and Anita Young and Charles H. Applegarth owned one-sixth interest each. On September 27, 1993, Anita I. Young and Charles H. Applegarth filed a disclaimer of any interest in the land. Accordingly, as of the date of the disclaimer, Mrs. Hughes had the record title to the property in question and ultimately was the lone plaintiff.

2. RP section 14–108(a) now governs an action to quiet title in real estate. It provides, in pertinent part:

Any person in actual peaceable possession of property, or, ... either under color of title or claim of right by reason of his or his predecessor's adverse possession for the statutory period, when his title to the property is denied or disputed ... the person may maintain a suit ... to quiet or remove any cloud from the title....

Md.Code Ann., Real Prop. § 14–108(a) (1974, 1996 Repl.Vol.).

versy for more than twenty years" and that such possession had been "open, notorious, exclusive, and hostile against all others" for in excess of twenty years. Both counter-plaintiffs asked that the court quiet their title to the 186–acre parcel and "grant declaratory relief establishing that counter-plaintiffs have absolute ownership and the right to disposition of" the property.

In February 1993, Lottie Mae executed and later filed a quitclaim deed in which she purported to convey all her rights, title, and interest in the 186–acre parcel to Russell, Jr. Lottie Mae's deed, after describing the location of the lands, read, in part:

> Being all those lands acquired and owned by William Russell Insley, Sr. and Lottie Mae Insley, his wife, and which property evolved unto Lottie Mae Insley upon the death of William Russell Insley, Sr., by operation of law, as the surviving tenant by the entirety.

On June 5, 1998, the circuit court entered partial summary judgment in favor of Mrs. Hughes on the issue of whether she held legal title to the subject property. Also on June 5, 1998, the court granted Mrs. Hughes's motion *in limine* to exclude evidence of *pendente lite* adverse possession and prohibited reference by either party to things that had happened subsequent to September 30, 1992—the date suit was filed. Accordingly, the evidence in the 1992 suit was limited to events that occurred before Mrs. Hughes instituted suit.

The first case came on for trial in July 1998. Russell, Jr.'s, counterclaim was considered by a jury, while Mrs. Hughes's complaint to quiet title (an equitable claim) was decided by the Honorable Richard D. Warren.

Russell, Jr., who was born in February 1958, did not claim in the first suit that he had personally adversely possessed the land for twenty years. Instead, he claimed that his father (Russell, Sr.) had adversely possessed the land until his death in January 1992 and that he (Russell, Jr.) was entitled to "tack" his father's possession onto his own because, (1) as a result of his father's adverse possession, his father and Lottie

Mae owned the 186 acres as tenants by the entireties; (2) upon Russell, Sr.'s, death, the property automatically became Lottie Mae's; and (3) Lottie Mae conveyed her interest in the property to him by deed in February 1993.

In closing argument, counsel for Mrs. Hughes pointed out the flaw in Russell, Jr.'s, claim that his adverse possession should be tacked to that of his father. Mrs. Hughes's counsel argued:

In other words, they have to be in your face for twenty years, in your face.

The other things they need to do is when—they need to show that when Russell, Sr., dies, the baton is passed to Toadie [Russell, Jr.]. How does the baton get passed? There is no deed. There is no will. There is no gift. There is no sale. There is no privity of estate. That's what it is, privity of estate means you have got to have a deed, a sale, a gift, a will. You can't just get it by being somebody's child. You can't just get it by being somebody's housemate.

On a special verdict sheet the jury found: (1) that prior to September 30, 1992, neither Lottie Mae nor Russell, Jr., had received a deed or other written instrument purporting to convey the disputed property to them; (2) that Russell, Jr., was in actual, exclusive, open, notorious, visible, and hostile possession of the subject property, but that his possession had not been without interruption for at least twenty consecutive years prior to September 30, 1992.

Based on these answers, Judge Warren entered judgment against Russell, Jr., and Lottie Mae on their counterclaim and denied them "relief of Declaration of Title on Adverse Possession."

In regard to the complaint filed by Mrs. Hughes, judgment was granted in favor of Russell, Jr., and his mother. Judge Warren said, prior to granting judgment against Mrs. Hughes:

The jury has found ... [the] facts, and the court is entitled, even in equity actions, to ask the jury to make findings of fact, that the defendants on the initial claim have been in actual[,] hostile, exclusive, open and notorious, and

visible possession of the property for some period of time but not fully 20 years. Based on that finding, the court finds that there has not been peaceable possession in the plaintiffs on the complaint for quieting of title, that being one of the two elements that are supposed to be established. Title was established but not the quiet possession.

Enter judgment in favor of the defendants and against the plaintiffs on the initial complaint.

No appeal was filed by any party from the judgments entered in the first action.

## IV. *THE SECOND LAWSUIT*

On October 25, 2000, Mrs. Hughes, by her son, Charles Hughes, as her attorney-in-fact,[3] filed a complaint for ejectment and other relief against Russell, Jr.; Lottie Mae, individually; and Lottie Mae, as personal representative of the estate of Russell, Sr. The complaint alleged that Mrs. Hughes was the record owner of the subject property; that by virtue of a final judgment dated July 13, 1998 (i.e., in the first case), "the court determined that the defendants, and each of them, had not acquired any ownership right in and to the subject property." The complaint further alleged that the defendants had entered, and continued to enter upon and occupy portions of the subject property by "tilling part of the property, hunting on parts of the property, dumping and disposing of scrap tires and other solid waste thereon, cutting of trees on parts of the property, and have otherwise interfered with" Mrs. Hughes's lawful right to possess the 186 acres. The complaint also alleged that the defendants were guilty of trespass in that they "entered upon and remained upon the" subject property "without authority or permission of" Mrs. Hughes. The complaint asked that the defendants be ejected from the property

---

**3.** Mrs. Hughes, in 1995, suffered a stroke and as a result was unable to manage her affairs.

pursuant to the provisions of RP section 14–108.1. Mrs. Hughes also asked that she be awarded possession of the property, compensatory damages, and other and further relief as the nature of her cause might require.[4]

An answer to the complaint was filed by the defendants. Russell, Jr., and Lottie Mae then filed a counterclaim and later an amended counterclaim. In the amended counterclaim, Russell, Jr., and Lottie Mae, individually and as personal representative, alleged that on April 4, 2001, Lottie Mae, in her capacity as personal representative of the estate of Russell, Sr., executed a deed of the subject property to herself, individually, as surviving spouse of Russell, Sr., pursuant to the terms of the decedent's will, which had been admitted to probate in the Orphans' Court for Dorchester County.[5] The counterclaim alleged that Russell, Sr., acquired "fee simple absolute title" to the subject property by virtue of his adverse possession of the property continuously and uninterruptedly for a period of twenty years prior to the initiation of the second suit by Mrs. Hughes; that the estate of Russell, Sr., acquired the land when Russell, Sr., died; and that Lottie Mae, in turn, acquired the land when she executed a deed, as Russell's personal representative, conveying the land to herself on April 4, 2001. Lastly, the complaint alleged that Russell, Sr.; Lottie Mae; and Russell, Jr., individually, or jointly and severally, acquired the fee simple absolute title to the subject property by adverse possession.

Mrs. Hughes filed an amended complaint in which she asked the court to declare that the deed to the subject property, dated April 4, 2001, which purported to convey title from Lottie Mae, as personal representative of Russell, Sr.'s, estate, to Lottie Mae, individually, be declared "null and void and of

---

4. The complaint also contained a count for waste. That count was later dismissed.

5. The exact date when the will was probated is not in the record, but it was sometime after the date the first trial was concluded.

no force and effect *nunc pro tunc* " and that the clerk of the court strike the April 4 deed from the land records of Dorchester County.

A bench trial was held, commencing February 2002, with the Honorable Marvin Smith, presiding. After hearing testimony from numerous witnesses concerning the issue of whether one or more of the Insleys had held the property by adverse possession for more than twenty years, Judge Smith found that "there's enough here that I would hold that ... [Russell, Jr.] has the property by adverse possession." Nevertheless, he ruled that the preclusive effect of the first suit barred Russell, Jr., from successfully asserting an adverse possession claim against Mrs. Hughes. Judge Smith likewise ruled that the doctrine of *res judicata* barred Mrs. Hughes from successfully prosecuting her ejectment and trespass claims.

Additionally, Judge Smith dismissed Lottie Mae's counterclaim insofar as it was filed in her capacity as personal representative of the estate of Russell, Sr. He opined that, because the estate had conveyed any ownership it had in the property, it was no longer an appropriate party to the counterclaim. The trial judge also entered the following written declaratory judgment:

> The proceedings having been considered, it is this 19th day of April, 2002, declared by the Circuit Court for Dorchester County that title to the ... [subject property] is vested in Plaintiff/Counter Defendant, Margaret Mende Hughes free and clear of any claim by the Defendants/Counter Plaintiffs, William Russell Insley, Jr. and Lottie Mae Insley and the Estate of William John Russell Insley, Sr.

Mrs. Hughes appealed the judgment entered against her. Russell, Jr., and Lottie Mae, individually, and as personal representative of Russell, Sr.'s, estate, filed a timely cross-appeal.

## V. ANALYSIS

### A. Arguments of Russell, Jr. in His Capacity as Cross-Appellant

#### 1. Russell, Jr.'s, Adverse Possession Claim—Without Reference to the Deed From Lottie Mae

■ Although Russell, Jr., later makes a contradictory argument in his brief, one of the claims he asserts is that, even disregarding the adverse possession of his father, he owns the 186 acres because he has held the land adversely to Mrs. Hughes since 1976 when he turned eighteen years of age. According to Russell, Jr., the property became his on February 5, 1996—his thirty-eighth birthday.

Russell, Jr., maintains that the reason he lost the first case was that in 1992—when the first case was commenced—he had only held the property adverse to Mrs. Hughes for approximately sixteen years and that because he was not allowed in the first case to put on evidence as to his adverse possession after September 30, 1992, it was unsurprising that the jury ruled against him. By contrast, by virtue of the counterclaim he filed in the second case, he was now able to show eight more years of adverse possession, *i.e.*, the eight years (approximately) between the filing of the first and second lawsuits. There are at least two serious flaws in Russell, Jr.'s, argument.

It is true that the *filing* of a suit to quiet title by Russell, Jr., did not stop the period of adverse possession from continuing. But Russell, Jr.'s, argument overlooks the fact that Mrs. Hughes defended against his suit to quiet title. When Mrs. Hughes interposed a defense to Russell, Jr.'s, counterclaim, the assertion of that defense did interrupt the period of his adverse possession. *See Rosencrantz v. Shields, Inc.*, 28 Md.App. 379, 394–95, 346 A.2d 237 (1975).

In *Rosencrantz*, the record title owner was Shields, Inc. *Id.* at 381, 346 A.2d 237. The Rosencrantzes' immediate predecessor in title, Jesse Smith, had held the disputed property by

adverse possession, commencing in May 1953.[6] *Id.* The Rosencrantzes purchased land bordering on the disputed property in May of 1964 and thereafter proceeded to hold the disputed property adversely to Shields, Inc. *Id.* at 383–84, 346 A.2d 237.

In October 1971, the Rosencrantzes filed a trespass, *quare clausum fregit*, suit alleging adverse possession against Shields, Inc., by the Rosencrantzes and their predecessors in title. *Id.* at 383, 346 A.2d 237. A judgment was entered in favor of Shields, Inc., due to a failure by the Rosencrantzes to show sufficient privity between Jesse Smith and *his* predecessor in title. *Id.* at 383–85, 346 A.2d 237. This meant that the earliest date that the Rosencrantzes could claim adverse possession was February 1953. *Id.* at 385–86, 346 A.2d 237. This also meant, of course, that, as of the date that suit was filed in 1971, the Rosencrantzes could show adverse possession for only eighteen years. *Id.* at 386, 346 A.2d 237.

After losing the first suit, the Rosencrantzes, in May 1974, filed a suit to quiet title against Shields, Inc. *Id.* at 381, 346 A.2d 237. In their second suit, the Rosencrantzes claimed that they (and their predecessors) now had held the disputed parcel for twenty years and that their unsuccessful 1971 suit did not interrupt the twenty-year period. We held that, while filing of the suit by the Rosencrantzes did not interrupt the period of adverse possession, the filing of a defense by Shields, Inc., did interrupt the twenty years. *Id.* at 394, 346 A.2d 237. In regard to the Rosencrantzes' claim, Judge Jerrold Powers, for this Court, said:

> If an action of ejectment, trespass to try title, or other appropriate action for the recovery of its corporeal estate in the land had been commenced *by*, rather than *against*, Shields, the *filing* of the action on 1 October 1971 would have interrupted the continuity of the adverse possession.

---

**6.** The *Rosencrantz* opinion mentions the possibility that there may have been a gap in Jesse Smith's adverse possession of the property between the latter part of 1963 and May of 1964 when the Rosencrantzes purchased the property. 28 Md.App. at 384, 346 A.2d 237.

*Id.* But the interruption did not take place with the commencement of the action, because the filing of suit by Mr. and Mrs. Rosencrantz was not an assertion of rights by Shields. It was the *defense* by Shields to the suit which constituted an assertion by it of an opposing right. It was that opposing claim by Shields which, when successfully prosecuted to judgment, interrupted the adverse possession.

The only remaining point which requires notice is that, even after it was adjudicated to hold title superior to that of appellants, Shields has not physically retaken possession. Mr. and Mrs. Rosencrantz have remained as before. We hold that this failure of Shields to reenter did not impair its right to do so. At most, the appellants started over again, from zero, on a new period of adverse possession.

The author says in 5 Thompson, *Commentaries on the Modern Law of Real Property*, § 2552, at 572–73 (Grimes repl.1957):

"Possession by the adverse claimant must be uninterrupted for the full statutory period, for to break effectively the possession at any time before the period has fully expired will arrest the running of the statute. The moment the running of the statute of limitations is interrupted the law restores the possession to the holder of the legal title, and the claimant by adverse possession must begin de novo. Upon interruption of the possession before completion of the statutory period, the possession of the true owner constructively intervenes, and should the claimant resume possession, the statute of limitations begins to run at the date of such resumption, and must run for the full statutory period thereafter in order to give the claimant title. If the possession be interrupted, either by fraud or force, or by process of law, the statute begins to run only from the time of reentry."

*Id.* at 394–95, 346 A.2d 237.

Based on the *Rosencrantz* case, we reject Russell, Jr.'s, claim that he, personally, held the property uninterruptedly between February 1976 and February 1996. The reason for

this is the same reason we rejected the Rosencrantzes' claim, *i.e.*, Russell, Jr.'s, adverse possession was interrupted by Mrs. Hughes's filing a defense to Russell, Jr.'s, counterclaim (in the first suit) in which he sought to quiet title. That defense was filed on February 16, 1993. Therefore, he has not personally held the land continuously since February 1976.

■ A second reason that we reject Russell, Jr.'s, argument that he holds title to the property, even without considering the deed he received from Lottie Mae, is that there was *no* evidence presented that Russell, Jr., ever held the disputed property adversely to anyone prior to his father's death in January 1992. The uncontradicted evidence in this regard was that starting in 1960, when Russell, Sr.'s, father died, and until January 1992, when Russell, Sr., died, Russell, Sr., farmed, timbered, hunted, trapped, and otherwise held the disputed property adversely to all others. In fact, Russell, Jr., admits as much in another section of his brief, where he says:

> During Russell Sr.'s life he acquired prescriptive title to the ... property [in dispute] either by descent from his father Curtis, who died in 1960, or independently in his own right, by virtue of his open, notorious, visible, exclusive, continuous, hostile, and adverse possession for his entire life until his death at age 71 in 1992.

### 2. Russell, Jr.'s, Claim that He Holds the Property by Virtue of a Deed Conveying Russell, Sr.'s, Estate's Interest in the Property

■■ Both parties agree that the evidence in the first and second case was, in large measure, the same. In both cases, it was agreed that Mrs. Hughes had record title to the disputed property. The central issue was whether Mrs. Hughes had lost title to that property due to adverse possession by someone else for a period exceeding twenty years. In both cases, evidence was introduced that Russell, Sr., held the disputed property adversely to Mrs. Hughes for over thirty years, *i.e.*, between 1960 when Curtis Insley died and January 1992 when

Russell, Sr., died. In the first suit, Russell, Jr., in his capacity as counter-plaintiff, attempted to quiet title in his name by asserting that title was vested in him by virtue of a 1991 quitclaim deed executed by his mother, in which she conveyed to him her interest in the 186 acres. As mentioned earlier, the 1991 deed recited that she and Russell, Sr., owned the disputed land as tenants by the entirety and that Russell, Sr., was now dead.

As a matter of law, Lottie Mae and Russell, Sr., never owned the land as tenants by the entirety. Title to land as tenants by the entirety must originate by a deed. *See* RP § 3–101(a)("[N]o estate of inheritance or freehold ... may pass or take effect unless the deed granting it is executed and recorded."). *See also* 41 Am.Jur.2d, *Husband and Wife* § 31, at 35 (1995), where it is said:

> It would seem that an estate by the entireties may not arise out of adverse possession, since an estate by the entireties cannot arise by operation of law but must originate in a grant or devise in which it appears on the instrument of conveyance itself that there was an intention to create an estate by the entireties.

(Footnote omitted.)

As can be seen, in 1998, when the first lawsuit ended, the interest in the disputed property once held by Russell, Sr., by virtue of his approximately thirty years of adverse possession, had never passed to Russell, Jr. In 1998, Russell, Sr.'s, interest in the land was held by his estate, but no personal representative had been appointed and the land had never been conveyed out of the estate.

After the first case concluded, two things of importance happened. First, Lottie Mae, who inherited all Russell, Sr.'s, property under his will, was appointed personal representative of Russell, Sr.'s, estate.[7] Second, Lottie Mae deeded

---

7. Section 1–301(a) of the Estates and Trusts Article of the Maryland Code (1974, 2001 Repl.Vol.), provides that, effective January 1, 1970, title to real estate passes to the personal representative. This changed

the estate's interest in the disputed property to herself. Because she had earlier quitclaimed all her interest in the property to Russell, Jr., Lottie Mae's subsequent deed to herself conveyed all the interest that Russell, Sr., had in the property to Russell, Jr., by virtue of the doctrine of after-acquired property. *See Columbian Carbon Co. v. Kight,* 207 Md. 203, 210, 114 A.2d 28 (1955).

It is a generally accepted principle in the law of conveyancing that a deed may have the effect of passing to the grantee a title subsequently acquired by the grantor. The grantor who executes a deed purporting to convey land to which he has no title or to which he has a defective title at the time of conveyance will not be permitted, when he afterwards acquires a good title to the land, to claim in opposition to his deed. This principle is based upon the ancient doctrine that such a deed operates upon the after-acquired title by way of estoppel. It has been stated that the title vests by operation of law or by inurement as soon as it is acquired by the grantor, without the need of judicial aid, in order to prevent circuity of action. It has also been stated that the doctrine applies regardless of whether the grantor assumed to convey title by fraud or mistake.

*Id.* (citations omitted).

Thus, if Russell, Sr., acquired the 186 acres during his lifetime by adverse possession, that title passed to Russell, Jr., due to the after-acquired title of Lottie Mae—unless such a claim against Mrs. Hughes was barred by the doctrine of claim preclusion.

In *Kent County Bd. of Educ. v. Bilbrough,* 309 Md. 487, 490, 525 A.2d 232 (1987)(quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.* 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984)), the Court said:

Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigat-

the previous law, which was that title to real estate passed directly to the heirs and devisees upon the owner's death. *See Goldman v. Walker,* 260 Md. 222, 226, 271 A.2d 639 (1970).

ed, because of a determination that it should have been advanced in an earlier suit. Claim preclusion therefore encompasses the law of merger and bar. See *id.,* Introductory Note [to Restatement (Second) of Judgments (1982)] before § 24.

In *Bilbrough,* the Court adopted the "transaction test" for determining whether the claims in the first and second cases were the "same." *Id.* at 497–500, 525 A.2d 232. The Court said:

> Restatement (Second) of Judgments describes the current approach of courts to answering the same claim-separate claim conundrum in § 24, comment *a,* at 197:
>
> > The present trend is to see claim in factual terms and to make it conterminous with the transaction regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff; regardless of the number of primary rights that may have been invaded; and regardless of the variations in the evidence needed to support the theories or rights. The transaction is the basis of the litigative unit or entity which may not be split.
>
> Consequently, the American Law Institute in § 24 of Restatement (Second) of Judgments has adopted the following standards for determining the "Dimensions of 'Claim' for Purposes of Merger or Bar—General Rule Concerning 'Splitting' ":
>
> > (1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see §§ 18, 19), the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.
> >
> > (2) What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or

motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

309 Md. at 497–98, 525 A.2d 232 (footnote omitted).

In rendering his decision in the case *sub judice,* Judge Smith found that Russell, Jr.'s, claim was barred by the doctrine of claim preclusion, as that doctrine was set forth in *Bilbrough, supra.* In Judge Smith's view, the only difference between the counterclaim brought in the first case and that brought in the second was that Russell, Jr., had "switched legal theories." In other words, Russell, Jr., changed from saying he had acquired legal title through Lottie Mae, who had, in turn, acquired Russell, Sr.'s, title as a surviving tenant by the entirety, to claiming in the second suit that he acquired Russell, Sr.'s, interest by virtue of the deed Lottie Mae, as personal representative, had signed, conveying to herself all of Russell, Sr.'s, interest in the land. We would agree with Judge Smith if, during the pendency of the first lawsuit, Russell, Jr., had available to him the alternate theory, but in our opinion the alternative theory did not become viable until April 4, 2001, when Lottie Mae, as personal representative, deeded the property to herself, which, by operation of law, conveyed it to Russell, Jr.

Restatement (Second) of Judgments, section 24, comment *f* (1982), reads:

Material operative facts occurring after the decision in an action with respect to the same subject matter may in themselves, or taken in conjunction with the antecedent facts, comprise a transaction which may be made the basis of a second action not precluded by the first.

Illustrations 10 and 12 of the Restatement provide examples as to how section 24, comment *f,* operates:

10. A brings an action against B to set aside a transfer of land on the ground that it was procured by fraud. A fails to prove the fraud and judgment is given for the defendant. A is not precluded from maintaining an action to recover the land on the ground that since judgment was rendered B has

forfeited the land to the plaintiff for breach of a condition in the conveyance.

\* \* \*

12. The government fails in an action against a defendant under an antitrust statute for lack of adequate proof that the defendant participated in a conspiracy to restrain trade. The government is not precluded from a second action against the same defendant in which it relies on conspiratorial acts post-dating the judgment in the first action, and may rely also on acts preceding the judgment insofar as these lend significance to the later acts.

*Id.*

The present case falls within the ambit of comment *f.* From Russell, Jr.'s, perspective, a material operative fact occurred after he lost his initial counterclaim to quiet title. That operative change was that his mother, as personal representative of the estate of Russell, Sr., deeded the property to herself, thus allowing him to prove, for the first time, that his father's interest in the property had passed to him by deed.

Mrs. Hughes disagrees. She contends that nothing prevented Lottie Mae during the pendency of the first case from opening an estate for Russell, Sr., and, as personal representative of that estate, deeding the property to herself. This is true as to Lottie Mae but not Russell, Jr. But *res judicata* (or claims preclusion) is an affirmative defense. Mrs. Hughes failed to produce evidence that, during the pendency of the first proceeding, Russell, Jr., could have opened an estate and transferred the property to Lottie Mae.

Mrs. Hughes also maintains that Judge Smith was correct when he ruled that Russell, Jr., had "merely switched legal theories." In support of this argument, she accurately recites the facts and holdings of the case of *Ballance v. Dunn,* 96 N.C.App. 286, 385 S.E.2d 522 (1989). Mrs. Hughes's argument is as follows:

An analogous case was decided by the North Carolina intermediate court of appeals in *Ballance, et al. v. Dunn, et al.,* 96 N.C.App. 286, 385 S.E.2d 522 (1989). The position of

the parties was the reverse of their position in this case. The [c]ourt determined that the plaintiffs were barred from seeking relief in a second case.

Although the North Carolina court used the term *res judicata* in its opinion, and not the term "claim preclusion," the [c]ourt referred to the same language in *Restatement (Second) of Judgments,* § 24, to which the Maryland Court of Appeals referred in *BOE v. Bilbrough.* Thus, it is clear that the basis for the North Carolina decision was the same as that of the decision of the Maryland Court of Appeals in *BOE v. Bilbrough.*

The North Carolina dispute involved a strip of land referred to as Sawyer Road. The plaintiffs had acquired their lands by two deeds, one dated 1947 and another dated 1948. While the opinion of the court does not say so, it seems apparent that neither the 1947 deed nor the 1948 deed actually included Sawyer Road. The plaintiffs claimed it was part of their holdings, and not a public road. The defendants asserted that Sawyer Road was a public road.

The plaintiffs originally sued in trespass, but later amended its suit to sound in adverse possession. The defendants counterclaimed for damages for being deprived of the use of the road. During the pendency of the first suit, the plaintiffs obtained two quitclaim deeds (herein, the "1984 and 1985 quitclaim deeds") for the road, but did not amend their first suit to include reliance on those deeds.

The first case was tried before a jury in September 1986. The trial court withheld the question of whether the road was a public road from the jury, determining that there was not enough evidence that the road had been accepted to present the issue to the jury. Thus, the only issue for the jury to determine was whether the plaintiffs had acquired title by adverse possession. *The jury decided against plaintiffs.* The

court entered judgement [sic] ... as follows: the plaintiffs did not acquire title to Sawyer Road by adverse possession; the defendants did not commit a trespass as

alleged; and the defendants failed to prove that Sawyer Road was a public right of way.

96 N.C.App. at 288.

In 1986, the plaintiffs filed a second suit, alleging battery and trespass. This time, the plaintiffs claimed record title based on the 1984 and 1985 quitclaim deeds. The defense was that the matter had been previously adjudicated. The matter was decided by partial summary judgment (on the plaintiffs' alleged ownership of the record title) in favor of the defendants. The plaintiffs dismissed the battery allegation and appealed. At issue on appeal was whether "the trial court erred in accepting the judgment in the *first case as a bar to the second because distinct causes of action were involved.*" 96 N.C.App. at 289.

The Court of Appeals upheld the trial judge's determination that the plaintiffs were barred by the decision in the first case.

We hold the case below arose from a single transaction. In both [the prior case] and [the current case] the plaintiffs brought an action in trespass to try title; the same parties and the same parcel of land were involved. The alleged trespasses were distinct in time, but the purpose of plaintiffs' claim was to establish title in Sawyer Road in themselves.

To this end plaintiffs initially alleged record ownership based on warranty deeds of 1948 and 1949; two months later they amended their complaint to allege, in the alternative, ownership by adverse possession. Approximately one month later, in November 1984, plaintiffs bargained for and received a quitclaim deed that purported to convey title to the parcel of land at issue. Approximately eleven months later, in October 1985, plaintiffs acquired another quitclaim deed to the same property. The plaintiffs' first action (Case No. 84CVD41) did not come to trial for nearly two years after they obtained the November 1984 deed and nearly one year after they obtained the October 1985 deed. Yet plaintiffs made no attempt to bring forward this evidence of ownership.

Instead the quitclaim deeds became the basis for plaintiffs' second action.

\* \* \*

\* \* \*

\* \* \*

The procedural history of the case below demonstrates that plaintiffs chose not to have all their claims adjudicated in the prior lawsuit. The doctrine of *res judicata* estops them from litigating any those [sic] claims in a second lawsuit.

96 N.C.App. at 291–92.

In these proceedings, the Insleys occupy much the same position as did the plaintiffs in the North Carolina case. The Insleys originally asserted ownership through adverse possession acquired by their predecessor in title, Russell Insley, Sr., who died before the 1992 case was filed. They sought to prove their succession to the claim of Russell Insley, Sr., by a deed, executed and recorded during the pendency of the prior case, from Lottie Mae Insley, as surviving tenant by the entirety, to Russell Insley, Jr. *There was nothing that prevented them from arguing in the 1992 case that their title was obtained through either survivorship or through inheritance, because the result (their succession of interest) would be the same in either event.* By making a deliberate choice to proceed exclusively on the basis of survivorship, they forfeited the ability to claim, in a later proceeding, that the succession of interest was through inheritance.

(Emphasis added.)

This argument is unpersuasive. Aside from treating the interests of Russell, Jr., and his mother as if they were the same, Mrs. Hughes's premise (that there "was nothing that prevented Russell, Jr., or his mother from arguing in the 1992 case that their title was obtained through either survivorship or through inheritance, because 'their succession of interest' would be the same in either event") is contradicted by her own counsel's closing argument to the jury in the first case. As of

1998, when the first trial ended, Russell, Jr.'s, counsel would not have been legally correct if he had argued that his client acquired his father's interest in the property through his mother's "survivorship or through her inheritance." As Mrs. Hughes's own counsel told the jury, a deed was required to transfer Russell, Sr.'s, interest.

Unlike the North Carolina case, when Russell, Jr., brought his counterclaim to quiet title in the first case, he did not "hold back a theory" that he could have used at any time during the first case. We shall therefore apply the exception to the usual claim preclusion rule set forth in Section 24 of the Restatement of Judgments, as explained in comment *f.*

We hold that Russell, Jr.'s, claim that he acquired title to the 186 acres by his father's adverse possession, coupled with the deed from his mother to him and the deed from the estate to his mother, is not barred by the doctrine of claim preclusion. And, as mentioned earlier, the trial judge said, in reaching his decision in this case, that were it not for the doctrine of claim preclusion he would have ruled that Russell, Jr., had proven title by adverse possession. Such a finding was well supported by the evidence that Russell, Sr., had adversely possessed the land for more than thirty years prior to 1992.

Because Russell, Jr.'s, claim that he acquired his father's interest in the property by deed was not barred by claim preclusion, and based on what Judge Smith said when he rendered his opinion, it follows that Russell, Jr., currently has title to the land. Therefore, the declaratory judgment entered in this case must be reversed, as well as the judgment entered in favor of Mrs. Hughes on Russell, Jr.'s, counterclaim.[8]

---

8. As mentioned earlier, Lottie Mae, as personal representative of the estate of Russell, Sr., was a named defendant in the second suit brought by Mrs. Hughes; also, Lottie Mae, as personal representative of Russell, Sr.'s, estate brought a counterclaim in the second suit. The trial judge dismissed Lottie Mae as a party in her capacity as personal representative because, after the February 5, 2001, deed by Lottie Mae, the estate no longer had an interest in the property. Russell, Jr., contends that (1) Lottie Mae, as personal representative of the estate of Russell, Sr., *did* have an interest in this litigation because the February 5, 2001, deed

## VI. CLAIMS OF MRS. HUGHES

Mrs. Hughes claims that Judge Smith erred in dismissing her second suit. She asserts that the doctrine of claim preclusion did not bar that second suit for several reasons. We need not decide whether the doctrine of claim preclusion barred Mrs. Hughes from bringing her ejectment and trespass claims against the defendants. Assuming, *arguendo*, that the doctrine of claim preclusion did not bar the suit, Mrs. Hughes would necessarily have lost on the merits anyway if the trial judge had not erroneously dismissed Russell, Jr.'s, suit to quiet title. As mentioned earlier, Judge Smith found that Russell, Jr., had proven that he had title by adverse possession. Once Russell, Sr., possessed the property adversely for twenty years, Mrs. Hughes lost her right to the property as against the Insleys and all others.

Title acquired by adverse possession is "the same as any acquired by grant, descent, or conveyance and can be lost or transferred only by the methods applicable to such titles." 3 A. James Cadner, *American Law of Property* § 15.14, at 829–30 (1952) (footnote omitted); *see also Campbell v. Fletcher*, 37 Md. 430, 434–35 (1873) (having acquired title by adverse possession, owner did not abandon title by removing herself from the property and her title descended on her death to her heirs at law).

For the foregoing reasons, we shall remand this case to the Circuit Court for Dorchester County for entry of a declaratory judgment, declaring (1) that Margaret M. Hughes has no

---

signed by her was a general warranty deed in which she promised that she would warrant generally "the property ... conveyed"; (2) under the covenant, the estate warranted "forever the property to the grantee against every lawful claim and demand of every person"; (3) under the covenant of general warranty, the estate had a legal duty and right to defend its prescriptive title and to defend its grantee against Mrs. Hughes's suit for ejectment and trespass; and (4) the doctrine of claim preclusion did not affect the counterclaim filed by the personal representative of the estate of Russell, Sr., because the estate was not a party to the first suit. We need not decide this issue because of our holding that Russell, Jr., has title to the property, acquired as a consequence of the February 5, 2001, deed.

interest in the property here at issue and (2) that the 186 acres at issue is owned by William R. Insley, Jr. In addition, the clerk shall upon remand: (1) enter judgment in favor of William Insley, Jr., on his counterclaim to quiet title and (2) enter judgment in favor of Russell, Jr., and Lottie Mae on Mrs. Hughes's complaint for ejectment and trespass.

**JUDGMENT REVERSED IN PART AND AFFIRMED IN PART; CASE REMANDED TO THE CIRCUIT COURT FOR DORCHESTER COUNTY FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS TO BE PAID BY MARGARET M. HUGHES.**